# IN THE SUPREME COURT OF TEXAS

No. 20-0378

IN THE INTEREST OF J.F.-G., A CHILD

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TENTH DISTRICT OF TEXAS

**Argued February 24, 2021**

JUSTICE BLAND delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE HUDDLE joined.

JUSTICE BLACKLOCK filed a dissenting opinion, in which JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BUSBY joined.

When Julie[1] was born, her father was a fugitive, having failed to report to prison to serve a four-year sentence for selling drugs. He previously had been convicted of other drug offenses. He reported to prison while Julie was an infant to serve his sentence. After eighteen months, he was released on parole. He then "almost immediately" committed robbery and was incarcerated for another seven-and-a-half years. Julie's father made almost no contact with Julie during his incarceration. He admittedly was unaware of concerning behavior by Julie's mother and the mother's boyfriend that put Julie at risk and eventually resulted in Julie's removal from the home.

---

[1] We refer to the child using the court of appeals' pseudonym. *See* TEX. R. APP. P. 9.8(b).

Julie's father emerged from prison when Julie was a pre-teen, happily situated with her foster family and her half-sisters. And although Julie's father took strides to reintegrate into the community and Julie's life, the trial court shortly thereafter terminated his parental rights. The court found that Julie's father had "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."[2] It further found that termination of her father's parental rights was in Julie's best interest.[3]

The court of appeals affirmed, holding that sufficient evidence supports the trial court's decision.[4] Julie's father petitioned this Court for review, contending that his incarceration, standing alone, is not legally sufficient evidence of endangering conduct. Because the evidence supports the trial court's finding that Julie's father engaged in conduct that endangered her physical or emotional well-being, we affirm.

# I

## A

Julie's father has spent much of his adult life in prison as a result of his escalating criminal activity. At seventeen, he was convicted of possession of marijuana, a minor drug offense. In June 2009, he was convicted of possession of a controlled substance—either hydrocodone or cocaine—and placed on probation for five years. Four months later, he was convicted of selling marijuana and sentenced to four years in prison. Rather than reporting to prison as required, Julie's father

---

[2] *See* TEX. FAM. CODE § 161.001(b)(1)(E).

[3] *See id.* § 161.001(b)(2).

[4] 612 S.W.3d 373, 383–84, 387 (Tex. App.—Waco 2020).

2

absconded, and he incurred a fugitive charge. After Julie's birth in March 2010, he turned himself in and served eighteen months. Upon his release from prison, her father "almost immediately" committed robbery and was jailed pending trial. He was convicted and sentenced to another eight years in prison.[5] Julie was just shy of two years old when her father returned to prison.

During her father's prolonged absences, Julie grew up with her mother, her mother's boyfriend (whom Julie calls "dad"), and their two children, Julie's younger half-sisters. Over the years, the Department of Family and Protective Services investigated multiple reports of neglect. The Department ruled out some of these reports, but there was "reason to believe" several incidents of neglectful supervision. During this time, Julie's mother's boyfriend was on parole for drug distribution. Julie's father was unaware of the Department's concerns and investigations; during his incarceration, he communicated with Julie's mother only about three or four times a year.

Late one night in May 2017, Julie's "dad" (Julie's mother's boyfriend) drove Julie and his older son to buy food. Intoxicated and on drugs, he crashed his car, killing his son. Julie sustained severe facial injuries caused by sliding on gravel. A trial court sentenced Julie's "dad" to twenty years in prison on one count of intoxication manslaughter, to be served concurrently with ten-year sentences for two counts of intoxication assault.

During the Department's investigation following Julie's injuries, a hair follicle test confirmed that Julie's mother had been using cocaine. The Department quickly filed this suit to remove Julie and her half-sisters from the home, and the trial court granted temporary orders placing the children in foster care. The Department notified Julie's father (in prison) that Julie had

---

[5] Julie's father was released on parole but served over seven years of his sentence.

been removed from her mother's care. Julie's father first learned of the circumstances surrounding the car accident when he was served with this suit.

About a year later, in May 2018, with the Department's agreement, the trial court permitted the Department to return Julie and her half-sisters to their mother on a monitored basis. The Department remained the children's temporary managing conservator. As part of the monitored return, the trial court ordered that Julie's mother's boyfriend, who was out on bond, be limited to twice-monthly supervised visitation in a public place. The trial court also ordered that he "not transport any of the children." When an investigator witnessed the boyfriend put the children in a car and get into the driver's seat, the trial court returned the children to their foster family, where they have remained since October 2018.

Meanwhile, still incarcerated, Julie's father appeared and answered the Department's suit in November 2017. Permanency reports to the trial court through November 2018 indicate that he had not engaged in services through the Department but had been in contact by letter. In February 2019, Julie's father moved to continue the final hearing, stating that he had "attended some classes while in prison" and anticipated that he would soon be released on parole. He was released on parole at the end of March 2019. The trial court granted the motion for continuance and set a new dismissal date.

Upon his release, Julie's father found employment. His mother offered him her residence in Tyler as a place to live. He also reconnected with Julie's mother, and she moved in with him at his mother's house. Julie's father planned for Julie and her half-sisters to live with them. In the six

4

months between his release from prison and the final hearing, Julie's father tested negative for drugs and attended twice-monthly visitation with the children.

At the time of the final hearing, Julie's foster family had cared for her for over two years and wished to adopt Julie and her half-sisters.

**B**

At the final hearing, held in September 2019, the trial court heard testimony from Julie's mother and father, a Department caseworker, and a Department investigator. In addition, the trial court "at the request of [Julie's father], conferred with [Julie] with her attorney ad litem present."[6] The mother's boyfriend, who is the father of Julie's two half-sisters, was incarcerated by that time and did not testify. The trial court admitted a psychological evaluation of Julie's mother as an exhibit.[7]

The caseworker recounted the events that took place after Julie's injuries in the car accident. She explained that Julie's mother allowed her boyfriend around the children, and one of the children indicated that the boyfriend drove them home from school, which disrupted the attempt at a monitored return in the summer of 2018. Later, the mother had "a few positive drug tests" for cocaine, namely a hair follicle test in November 2018 and a nail test in January 2019. The mother's boyfriend also had tested positive for cocaine.

---

[6] Although the trial court noted the conference in its letter ruling to the parties, there is no reporter's record of it.

[7] In that report, the mother "negated the relevance" of the Department's history of referrals based on reports of drug use and sales in the house and neglectful supervision, stating that her aunt who made the reports "lied on me a lot."

The caseworker reported that Julie was "doing great" in her foster placement.

On cross-examination, the caseworker acknowledged that Julie's mother and father had attended two or three therapy sessions, which had "been positive," including one immediately before the hearing. Between May 2019 and the final hearing in September 2019, Julie's father had visited with Julie twice a month at the Department's offices. The home that Julie's father lived in was suitable.

The investigator also described the events leading to the disruption of the trial court's monitored return in August and September of 2018. After several failed attempts to contact Julie's mother, the investigator went to speak with Julie and her half-sister at school. They reported that their mother's boyfriend had dinner at their house on a Sunday and took them to school the next morning. The investigator also witnessed the boyfriend placing the children into a car and getting into the driver's seat with the mother in the passenger seat. The caseworker stated that, although Julie's mother initially denied it, she eventually "broke down and confessed to [the Department] that he had been around the children."

Julie's mother testified as well. She explained that she began a relationship with her boyfriend right after Julie's father was arrested for robbery and went to prison. She raised Julie from birth to age seven until the Department placed Julie and her half-sisters in foster care after the accident. Contrary to the caseworker's and investigator's accounts, she denied allowing her boyfriend around the children during the monitored return. She contested the results of her failed drug tests, stating that they were "not accurate." She admitted, however, that she knew that her boyfriend had "a cocaine issue" as early as 2016, before the car crash in 2017. She understood that

6

he ultimately tested positive for cocaine at the time of the car accident and tested positive for cocaine after the Department removed the children from her care.

Julie's mother immediately reunited with Julie's father upon his release from prison in March 2019. She testified that he sent the children birthday cards and wrote letters to them. She stated that she had completed the services that the trial court ordered and that her children desired to live with her and were "very well bonded" with her.

In his testimony, Julie's father admitted to his past crimes. He had contact with Julie's mother only three or four times a year and had not seen Julie from the time she was four years old until his release from prison six months before the final hearing. But he recounted steps he was taking to change his earlier conduct. He left gang membership while in prison and took cognitive intervention, anger management, and job training classes. He also completed twenty-nine hours of parenting classes after he became aware of this suit. Upon his release on parole, he engaged in services, was drug-free, and visited with a counselor two or three times.

He conceded that he was unaware of Julie's mother's drug use—or her boyfriend's drug use and criminal history—before the Department's suit. When he became aware, he believed Julie's mother's statement that the drug-test results were all false positives. He conceded that he had caused instability for Julie by being "in and out of prison" nearly all of Julie's life.

Despite the father's commendable post-release behavior, the trial court found "by clear and convincing evidence that the state ha[d] met the burden of proof to terminate [the father's] parental

rights to his child on the E ground, and that terminating his parental rights is in the best interest of his child."[8]

The court of appeals affirmed.[9] The court held that legally and factually sufficient evidence supports the trial court's finding that the father had "engaged in conduct" that endangered Julie's physical or emotional well-being and also had "knowingly placed the child with persons" who had engaged in such conduct.[10]

In this Court, Julie's father argues that the evidence is legally insufficient to show that he committed any endangering conduct, urging that incarceration alone cannot support an endangerment finding under subsection (E).[11] He further argues that no evidence supports the trial court's finding that he "knowingly placed" Julie with others who engaged in endangering conduct. The Department responds that Julie's father's criminal acts and drug use, resulting in his lengthy periods of incarceration and absence from her life for more than eight years, constitute conduct that endangered Julie's physical or emotional well-being.[12]

---

[8] *See* TEX. FAM. CODE § 161.001(b)(1)(E).

[9] 612 S.W.3d at 380.

[10] *Id.* at 382–84, 387 (quoting TEX. FAM. CODE § 161.001(b)(1)(E)). In a footnote, Chief Justice Gray dissented, contending that the majority had improperly attributed the mother's conduct to the father. *Id.* at 379.

[11] In the alternative, Julie's father argues that the court of appeals erred in its factual-sufficiency analysis. However, "[w]e do not have jurisdiction to conduct a factual sufficiency review." *In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) (per curiam) (citing TEX. CONST. art. V, § 6). And although we can "ensure that the courts of appeals adhere to the proper legal standard of review," *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002), the father did not brief any argument that the court of appeals applied the wrong standard. We nonetheless conclude that the court of appeals applied the proper standard for a factual-sufficiency review, accurately citing our precedent and detailing the evidence supporting and opposing the trial court's findings. We therefore confine our review to the father's legal-sufficiency argument.

[12] The Department alternatively responds that legally sufficient evidence supports the trial court's finding that Julie's father "knowingly placed" her with others who endangered her physical and emotional well-being. Because

8

## II

## A

The United States Constitution and the Texas Constitution protect parents' rights to raise and nurture their children.[13] For the State to deny these rights to a parent, it must establish by clear and convincing evidence a legal ground to terminate the parent's right and that termination is in the child's best interest.[14]

This "high evidentiary burden" requires a "heightened standard of review" on appeal.[15] It does not dispel, however, the deference that an appellate court must grant to the factfinder, who heard the witnesses and evaluated their credibility. As we have explained, our legal-sufficiency review "take[s] into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof."[16] Because the factfinder "is the sole arbiter of the witnesses' credibility and demeanor,"[17] appellate review must defer to the trial court's factual determinations, even in parental termination cases.[18] We "assume that the factfinder resolved disputed facts in favor of its

---

we hold that the evidence is legally sufficient to support the trial court's finding that the father's own conduct was endangering to Julie, we need not address the Department's alternative argument.

[13] *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam) ("The United States Constitution and Texas Constitution provide parents due process rights as to the care, custody, and control of their children.").

[14] *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

[15] *N.G.*, 577 S.W.3d at 235.

[16] *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[17] *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

[18] *J.F.C.*, 96 S.W.3d at 266.

finding if a reasonable factfinder could do so," and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[19] Our legal-sufficiency standard in parental termination cases "honor[s] not only the elevated burden of proof, but also the deference an appellate court must have for the factfinder's role."[20]

**B**

Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest.[21] In total, section 161.001 lists twenty-one grounds for termination.[22] A trial court may conclude that a parent's conduct satisfies multiple grounds, but one predicate finding—coupled with a finding that termination is in the child's best interest—is enough to uphold the judgment on review.[23]

In this case, the trial court found the statutory ground for termination under subsection 161.001(b)(1)(E). It permits a trial court to terminate parental rights if it finds that the parent has:

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.][24]

---

[19] *Id.*

[20] *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

[21] Tex. Fam. Code § 161.001(b). "The second termination prong—best interests—is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631.

[22] Tex. Fam. Code § 161.001(b)(1).

[23] *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under [the statute] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

[24] Tex. Fam. Code § 161.001(b)(1)(E).

Endangering conduct under subsection (E) need not "be directed at the child."[25] Nor must the child "actually suffer[] injury."[26] "Rather, 'endanger' means to expose to loss or injury; to jeopardize."[27] In *Texas Department of Human Services v. Boyd*, we acknowledged that "Texas cases have considered the involuntary termination of the rights of an imprisoned parent, and have held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," but we nevertheless held that incarceration does support an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child."[28] A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment.[29] Imprisonment thus "is certainly a factor" the trial court may weigh when considering endangerment.[30]

The text of subsection (E) has remained constant since the enactment of the Family Code in 1973, even as the Legislature has reworked other existing grounds and added new ones through

---

[25] *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

[26] *Id.*

[27] *Id.* (citing *Endanger*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 599 (1976)).

[28] *Id.* at 533–34.

[29] *See In re J.O.A.*, 283 S.W.3d 336, 345–46 (Tex. 2009).

[30] *Boyd*, 727 S.W.2d at 533.

multiple revisions.[31] Among other things, the Legislature added that a court may terminate parental rights if it finds that the parent has: "been convicted or has been placed on community supervision . . . for being criminally responsible for the death or serious injury of a child"; "used a controlled substance . . . in a manner that endangered the health or safety of the child"; or "knowingly engaged in criminal conduct" resulting in "imprisonment and inability to care for the child for not less than two years from the date of filing the petition."[32]

Newer subsections of the statute identify particular circumstances in which a crime or imprisonment, standing alone, supports termination.[33] When it added these grounds, however, the Legislature did not circumscribe subsection (E) or exclude incarceration from conduct that might

---

[31] Act of May 25, 1973, 63d Leg., R.S., ch. 543, § 1, sec. 15.02, 1973 Tex. Gen. Laws 1411, 1427 (providing for termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child").

[32] TEX. FAM. CODE § 161.001(b)(1)(L), (P), (Q). The Department did not plead these subsections as grounds for termination in this case.

[33] Four grounds added after subsection (E) address criminal activity. *Id.* § 161.001(b)(1)(L), (Q), (T), (U). The Legislature added subsection (L) in 1989. Act of May 23, 1989, 71st Leg., R.S., ch. 808, § 1, sec. 15.02, 1989 Tex. Gen. Laws 3673, 3674. Subsection (L) allows for termination where a parent has "been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child." TEX. FAM. CODE § 161.001(b)(1)(L). The Legislature added subsection (Q) in 1997. Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, sec. 161.001, 1997 Tex. Gen. Laws 2012, 2015. Subsection (Q) provides for termination where the parent "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition[.]" TEX. FAM. CODE § 161.001(b)(1)(Q). The Legislature added subsection (T) in 2005. Act of May 24, 2005, 79th Leg., R.S., ch. 508, § 2, sec. 161.001, 2005 Tex. Gen. Laws 1395, 1397. Subsection (T) allows for termination where the parent has "been convicted of: (i) the murder of the other parent of the child . . . ; (ii) criminal attempt under Section 15.01, Penal Code . . . ; (iii) criminal solicitation under Section 15.03, Penal Code . . . ; or (iv) the sexual assault of the other parent of the child." TEX. FAM. CODE § 161.001(b)(1)(T). Finally, the Legislature added subsection (U) in 2017. Act of May 8, 2017, 85th Leg., R.S., ch. 40, § 2, sec. 161.001, 2017 Tex. Gen. Laws 99, 101–02. Subsection (U) provides for termination where the parent has "been placed on community supervision, including deferred adjudication community supervision . . . for being criminally responsible for the sexual assault of the other parent of the child." TEX. FAM. CODE § 161.001(b)(1)(U).

endanger a child's physical or emotional well-being.[34] Lengthy incarceration presents a risk of endangerment to the child's well-being—such a significant risk, in fact, that the Legislature provides for the *pre-emptive* termination of parental rights, even before the risk associated with incarceration manifests itself.

The more recently added grounds for termination thus do not exclusively define the circumstances in which a parent's crimes or incarceration can support termination, as the dissent posits. To the contrary, in the years since our holding in *Boyd* that imprisonment may be some evidence of endangerment, the Legislature has expanded the grounds for termination, not curtailed them.[35] The Legislature also did not amend the endangerment provision to provide that courts must not consider evidence of crimes and imprisonment under subsection (E). We expressly have held that a conviction can be "a relevant factor in establishing an endangering course of conduct" under subsection (E).[36] In the dissent's view, a trial court must ignore evidence of criminal conduct and incarceration, however long and damaging the parent's absence is to a child's physical or emotional well-being, for purposes of subsection (E). Such a conclusion is contrary to the text of subsection (E), which does not say that termination may be based on endangering conduct *except* when such conduct leads to incarceration.

---

[34] "The history of [the statute] and its statutory predecessors confirms" our interpretation. *Pruski v. Garcia*, 594 S.W.3d 322, 328 (Tex. 2020); *see id.* at 328 n.2 ("[T]his is the history of the legislation, not legislative history." (alteration in original) (quoting *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 445 n.31 (Tex. 2011) (Willett, J., concurring in part))); *see also Waak v. Rodriguez*, 603 S.W.3d 103, 105–06 (Tex. 2020) (interpreting a statute by "examin[ing] its history").

[35] *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987) (holding that "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under [(E)] is supportable").

[36] *In re E.N.C.*, 384 S.W.3d 796, 804–05 (Tex. 2012).

The grounds for termination are not mutually exclusive; rather, the same conduct may support multiple grounds and a finding that termination of a parent's rights is in the child's best interest.[37] We agree that subsection (E) should not be read so capaciously as to "render the legislature's painstaking enumeration of other predicate acts superfluous."[38] But under subsections (L), (Q), (T), and (U) a single criminal conviction may result in termination.[39] These grounds allow the Department to act swiftly to protect children without specific evidence of long-term abandonment.[40] In such cases, the State may "act in anticipation of a parent's abandonment of the child" due to incarceration, not in response to it.[41] "Thus, if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection Q to ensure that the child will not be neglected."[42]

The same is not true for subsection (E). As we have emphasized, under that provision, the mere fact of a conviction will not support termination. Nor does a crime become conclusive evidence of "endangering" conduct because it results in incarceration. But such evidence—which

---

[37] *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) ("While it is true that proof of acts or omissions under section [161.001(b)(1)] does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues.").

[38] *Post* at 4. In some cases, community supervision without incarceration is enough. *See* TEX. FAM. CODE § 161.001(b)(1)(L), (U).

[39] TEX. FAM. CODE § 161.001(b)(1)(L), (Q), (T), (U).

[40] *See In re H.R.M.*, 209 S.W.3d 105, 109–10 (Tex. 2006) (per curiam) (reversing court of appeals for failing to give due deference to the jury's fact findings supporting termination based on (Q) where the father introduced some evidence related to a potential parole but had multiple years remaining on his sentence, had twice been denied parole, and had not provided financial or emotional support or arranged care for the child in his absence).

[41] *In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003).

[42] *Id.* Although the Department did not plead for termination based on ground (Q), we note that the father was incarcerated for over two years.

in this case includes multiple criminal episodes of escalating seriousness—together with the duration and consequences of the incarceration, is relevant when the resulting abandonment presents a risk, as it did here, to a child's physical or emotional well-being.

### III

Julie's father committed increasingly serious crimes—among them, possession of a controlled substance, sale of marijuana, and robbery. The trial court could fairly consider these convictions—and their corresponding periods of imprisonment—under subsection (E). Her father's criminal record shows a pattern of escalating conduct, not an isolated incident. He did not stop engaging in criminal activity after Julie was born, when he would (or should) have been aware that criminal conduct, like committing robbery, risked separating him from Julie for years, as, in fact, it did. Her father's sale of illegal drugs qualifies as endangering conduct for similar reasons.[43] Particularly significant is the duration of his imprisonment, which totaled more than eight years. Julie recently turned eleven. Before his release from prison six months before the final hearing, Julie had last seen her father when she was four years old.

There is sparse evidence that Julie's father supported Julie's physical or emotional well-being. His omissions, spanning throughout her childhood, exposed Julie to physical and emotional loss, as he did not care for, nurture, or protect her. In her father's absence, Julie's mother's boyfriend injured her. Julie's father testified that he did not know the details of Julie's living

---

[43] *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("We have previously said that endangering conduct is not limited to actions directed towards the child. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." (citation omitted)).

situation—and that she was at risk—until the Department initiated these proceedings. He argues that this lack of knowledge precludes any finding that he "knowingly placed" Julie with others who endangered her. But his lack of knowledge resulted from criminal conduct that led to his incarceration and his indifference to his daughter while he was incarcerated. The trial court could have viewed this testimony as evidence of his own omissions in caring for Julie's well-being.

We are required to view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility, and visited with Julie herself. In crediting the father's testimony about his contact with Julie—which even at face value was very limited—when there are reasons to disbelieve it, the dissent disregards our standard of review. We cannot substitute our judgment for the factfinder's.

Julie's father relies on our decision in *In re E.N.C.*, in which we rejected the notion that "[a]ny offense committed by a citizen that could lead to imprisonment or confinement . . . establish[es] endangerment, simply because the parent's ability to be present in his children's lives would be uncertain."[44] In that case, authorities had deported the father. In concluding that the evidence did not support termination, however, we noted that the father had never "abandoned his parental responsibilities."[45] Instead, the "undisputed evidence" showed that the parents in that case "lived together as a family unit without apparent incident until they separated, and [the father] and his family remained a regular presence and source of support in the children's lives after he was

---

[44] 384 S.W.3d 796, 805 (Tex. 2012).

[45] *Id.*

16

deported."[46] We noted the "important differences" between incarceration and deportation: "Unlike an incarcerated individual, a person who is deported is able to work, have a home, and support a family. More importantly, it is possible for the person's children to live with him."[47] In contrast to *E.N.C.*, the record in this case supports the trial court's implied finding that Julie's father was not a presence or source of support in her life.

The dissent suggests that "criminal history," "imprisonment," and "normal disruptions in family life caused by imprisonment" are not enough to constitute a finding of endangerment.[48] The "disruption" in this case was not "normal"—Julie's life was placed at risk while her father was completely absent from her life for more than eight years. Julie's mother admitted that she had contact with the father only three or four times a year. Leaving aside incarceration, an absence of that duration resulting from criminal conduct is sufficient evidence to establish a "pattern of conduct that is inimical to the very idea of child-rearing" that endangered Julie's physical or emotional well-being.[49] The trial court, as the factfinder, could reasonably conclude that such a disruption is qualitatively different from a single, short-term incarceration.

This is not to say that "mere imprisonment"—past or present—conclusively constitutes endangerment under subsection (E).[50] Not all incarceration means that a parent will be absent from

---

[46] *Id.* at 805–06.

[47] *Id.* at 806.

[48] *Post* at 3 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

[49] *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[50] *Id.*

a child's life for a lengthy duration. In Julie's father's case, however, his absence from Julie's life for a lengthy duration was not uncertain; it was a reality.

Julie's father further argues that his engagement in services and his unimpeachable conduct during the six months before the final hearing conclusively negates the trial court's endangerment finding. We have emphasized, however, that a parent's short-term, positive, post-incarceration behavior does not nullify earlier endangering conduct such that the trier of fact must set the earlier conduct aside. As we observed in *In re J.O.A.*: "While the recent improvements made by [the father] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."[51] In that case, we criticized the court of appeals' legal-sufficiency review for "attributing greater weight to [the parent's] recent improvements and less to his past challenges."[52] We did "not question the court's logic" but "reject[ed] its use . . . as part of the legal sufficiency review."[53] To employ such logic in this case would elevate our assessment of Julie's father's testimony over the trial court's assessment, in disregard of the appellate standard of review. That standard requires us

---

[51] 283 S.W.3d 336, 346 (Tex. 2009). *In J.O.A.*, the father admitted to marijuana use before the children were born. *Id.* After the children's birth, he was incarcerated on domestic violence charges. *Id.* Upon his release, however, he "obtained steady employment, improved housing, and reliable transportation for his children." *Id.* He "attended parenting classes, exercised regular visitation, and passed three successive drug tests." *Id.* Still, he tested positive for marijuana shortly before the final hearing and remained delinquent in his child support. *Id.* Despite the strong evidence of his improvement, we concluded that legally sufficient evidence supported termination. *Id.* Similarly, in *In re C.H.*, we described aspects of the Father's conduct that not only supported the trial court's predicate finding of (E) but also supported its best-interest determination. 89 S.W.3d at 28–29 (holding that the court of appeals applied an incorrect factual-sufficiency standard and improperly disregarded evidence supporting the finding that termination would be in the child's best interest). We noted that the father, who was incarcerated at the time of trial, had not provided "emotional or financial assistance" to the child after his birth, had an "extensive criminal history," which continued after the child's birth, and had "no concrete plan to provide emotional or physical care" for the child. *Id.* at 20–21, 28.

[52] *J.O.A.*, 283 S.W.3d at 346.

[53] *Id.*

18

to defer to the trial court's judgment of the credibility of the witnesses in a bench trial, even in parental termination cases.[54]

Although "parental rights are of constitutional magnitude, they are not absolute."[55] It is imperative that courts recognize the constitutional underpinnings of the parent–child relationship, but courts must not sacrifice a child's emotional and physical well-being to preserve those rights when their corresponding obligations go unfulfilled for years.[56] We decline the invitation to draw a bright-line rule that incarceration cannot support an endangerment finding under subsection (E). It is enough to properly apply our existing precedent and accord the trial court's findings the deference they are due. Not every course of criminal conduct will result in the tragic consequences of this case, where Julie and her father were separated for nearly all of her childhood.

\* \* \*

Although her father's strides toward overcoming his past conduct are important in evaluating Julie's best interests, his rehabilitation does not negate his past criminal conduct and incarceration such that a trial court could not consider them to have been endangering to Julie. Based on the evidence before it, the trial court reasonably could have formed the firm belief that Julie's father engaged in endangering conduct under subsection (E). We note, specifically: his absence from her childhood for more than eight years; his history of dealing drugs; his choice not

---

[54] *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam).

[55] *C.H.*, 89 S.W.3d at 26.

[56] *Id.*; *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) ("[T]his Court has stated that 'the rights of natural parents are not absolute; protection of the child is paramount. . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities.'" (second alteration in original) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))).

19

to monitor her safety during his incarceration; and his minimal effort to contact Julie or be part of decisions regarding her health, education, or well-being. Julie's father does not contest that termination of his parental rights is in Julie's best interest.

Accordingly, we affirm the judgment of the court of appeals.

                _____

                Jane N. Bland
                Justice

OPINION DELIVERED:  May 21, 2021